Before we begin, for those of you who have not appeared in our court before, just two very brief comments. As you make your argument, you may safely assume that we've had a chance to review the briefs, the record excerpts, and in some instances we've had a chance to review the record itself. So feel free to go right to the heart of your argument as you make it. Second, for those of you unfamiliar with our lighting system, you'll note that there's a clock sort of keeping time, and there is a red light, an amber light, green. Green means, of course, you may proceed. The amber or yellow is a two-minute warning, and the red light indicates that your time is up, and so we'd be much appreciative if you could bring your remarks to a conclusion when that light goes on. Again, you don't have to stop in the middle of a word or a sentence or a thought, but if you could bring it to a conclusion at that time, we'd be much appreciative. With that, we'll proceed with the first case, U.S. v. Gladys and Mario Fuertes. Good morning. Good morning, Your Honor. Angela Wright on behalf of Gladys Fuertes, the co-counsel, we will spend our time. May it please the Court, without waiving any of the other issues of the brief, I will focus my argument on the loss issue. In this case, as the Court is aware, the defendant, Ms. Fuertes, received a combined 23-level increase as a result of the loss calculation that was applied in the District Court. Our position is that, based on this Court's holding in Moran and other cases in the Fifth Circuit as well as this Circuit, that the sentencing loss cannot be speculated and it cannot be based on a reasonable determination. Specifically, in this case, there's no dispute that Ms. Fuertes was not a novice with health care clinics. We have the 404B issue, which certainly highlights the fact that they have been in business with these kind of clinics for years and was very well aware, the record is clear, of the Medicare reduction rate. Our argument is that this was a clear error on the part of the District Court, that in pretrial, the government made arguments that with the 404B loss out there, that it would not be part of the sentencing in this case. However, that is not the result that would happen at sentencing. Our argument is that the loss, the intended loss, is not the aggregate loss. Explicitly, that's been the findings or the holdings in the courts on this matter. The culpability of Ms. Fuertes . . . Did you put on evidence? I'm sorry if my thing's not on. I didn't mean to interrupt you. Did you put on evidence about what your client's expected loss would have been? I was not trial counsel. There was no specific evidence. There were two sentencing hearings. That was highlighted in the sentencing hearings, but there was no detailed, specific calculation from my recollection by the court or by counsel for this defendant. The reason I ask is that I think that I've read in the transcript that the District Court said that because the defendants didn't put on any evidence, they didn't know either what the defendants knew or didn't know. That distinguishes this case from Moran. There was hard evidence in Moran. I would agree. Several of the cases, including Moran, there was some testimony about what the . . . that was put on. However, I think counsel preserved that enough because there were multiple arguments, including in the pretrial, with projected differences in her sentencing, had the court actually applied the reduced rate. They stopped short of actually coming up with numbers, but other than not coming up with actual numbers, counsel, in every way possible at that time, presented the argument that the aggregate loss was way out of sync and was not appropriate. The District Court seemed to be a little inclined and concerned about that. I agree that there was conversation about whether or not she was responsible for that. I would offer to the court that there was so much evidence in this case, so much nondisputed evidence in this case about the Medicare rate, that payments were never made in full throughout any of the transactions, that it was compelling and basically incumbent on the court, perhaps, to have that evidentiary hearing and make specific findings of fact about the loss. I would add to my remarks not to get into the 404B argument, which I'm not waiving will be addressed, perhaps, by a co-counsel. In those conversations, when we're talking about including the loss beyond the charge conduct, we're also talking about the GNS clinic, the one that had the $10 million added to it. There was no testimony in any type of detail in comparison to, admittedly, the detail of the way that the clinics had the fraudulent transactions in Gables. In that respect, the court would not have had the benefit of, whether there were kickbacks, whether there was what was legitimate, what was not legitimate, to lump sum all of that into the intended loss. Further highlights, in my opinion, the excessive sentence, the sentence that's not based on relevant conduct, that's not based on culpability and intended loss. Just to make sure that I have your argument straight about the Medicare reimbursement rate, is it your position that now, in retrospect, of course, we know that Medicare doesn't always pay full freight and, therefore, that the defendants couldn't have intended to cause the full loss, or that the evidence was so overwhelming before the district court that we can infer that, in fact, the defendants didn't intend to cause the entire loss? The latter. Okay. It's my position that the record was overwhelmingly clear. Pre-trial, based on the government's assertion, they didn't go into the calculation, of course, but actually, during the trial, multiple objections and that sentencing, it was discussed, and I will concede, there was no explicit formula presented. There seemed to be an open discussion on the record between the government defense counsel and the court about this issue, but it wasn't solved. Unfortunately, we're here, but fortunately, we're here to argue before this court for some relief. I would add, in my brief time, thank you. You've reserved your full three minutes for rebuttal. Thank you. Good morning. Good morning. My name is Attorney Ann Borgetti, and I was not trial counsel. I was trial counsel for 35 months. I am not waiving any of my issues in the brief. I would like to move directly to roll, because the fourth issue, because I think that is my . . . Mr. Fuertes believes it's his best shot at receiving a reduction in that sentence. This gentleman is quite a large gentleman. He's from New Jersey originally. He played football at Rutgers. His second marriage was to the co-defendant, Gladys Fuertes. That was in 2004. In 2006, Ms. Fuertes, with her family, begins these companies that are doing this billing. That company was GANS Medical, and then it becomes Morgan, then it becomes the Gables, which is the substantive company in the trial, and NG&F. This gentleman had a background of working security. When he's indicted and he goes to trial, the jury trial lasts about six days. On that sixth day, the jury goes out. They deliberate for four hours. The next day, when they come back, they deliberate for two hours, and then they have five questions. The court, Judge Buckley says, if she was to guess, she would say, this is about Mr. Fuertes, about his role, because those questions go to . . . basically, I won't go through all the questions, but is he a willing participant versus a knowing spectator? They choose that he's a knowing spectator. He's convicted and goes to sentencing. When the judge looks at everything she's heard from the evidence, from what's presented at the sentencing, she starts to think out loud, and she says, right away, I'm thinking of giving Mr. Fuertes a minor role. She says she keeps a list of what he did, and she says he had such minor participation. His name may have been on the company, but he didn't do any of the billing. He didn't participate in any of the billing. He didn't have any contact with the billing. What the judge keeps the list of is that he presented sodas and pizzas to people. He was present at the Starbucks meeting that is part of the obstruction. He visited people and gave them paperwork. He gave prescription scripts for the drugs to Brian Kelly, the co-conspirator who was deceased at the time of the trial. The difficulty that I'm having is the standard of review by which we have to look at the district court erred in not giving him a minor role reduction under the guidelines. We review that, as you know, only for clear error, which means whether we would agree or disagree, you've got to show that the district court really was wrong and made a mistake here because we are obliged to defer to what we characterize as findings of fact, and this is a fact-finding inquiry. Where is the clear error in the determination that he was not entitled to a minor role reduction? That is to say, essentially in the determination that he was not less culpable, let's say, than other participants involved in the relevant conduct. Clearly, even the judge said, you're clearly less responsible than Gladys, but she said you're not clearly less responsible than, substantially less culpable, excuse me, than the average participant. What she's wrong in is because of Brian Kelly, the man that's deceased. This fraud targeted HIV patients. Brian Kelly died from HIV. Now, he recruited people, he dealt with Gladys, he knew of the scheme. My client did not know about the scheme, so there, I think that she is wrong. The judge is clearly wrong because it was not only Gladys who the court even said was overwhelming the evidence, but also Brian Kelly. Then you have the patients that knew and directly intended to do this fraud. You have all the patients, you have my client who is in the same position as the doctors who were duped. Thank you very much. Thank you. May it please the court, Roberta Bodner for the United States. The court was very specific and detailed in its factual findings for the sentencing calculations, and those findings are fully supported in the record. Now, with respect to the intended loss versus actual loss, the sentencing guidelines actually use the example of an insurance company where the claimed amount is less than the insured value as a situation where the loss was unlikely or impossible to occur, and you still use intended loss. The guidelines also talk about in a government Medicare fraud case where intended loss is the claim submitted. As the district court found precisely that there was no evidence from which it could conclude that the defendants intended another loss. Yes, the objection was preserved, no question about that, but there wasn't any evidence as to what the actual loss would have been if they or that they had intended less than the claimed amount. To the contrary, the evidence was that their intention was to bilk Medicare for as much as they possibly could, and that's what the district court found. That's well supported in the record. The district court expressly rejected this notion of, no, I should just find the actual loss that the companies paid because it said it would have had to base that on the argument that, well, everybody knows an insurance company never pays what the claim is. There was some testimony about early on from Agent Ives and I think also from the Medicare fraud expert about how Medicare claims are paid and that there's a regional factor that goes into how much they pay of a claim, but there was absolutely no testimony about how specifically each of the claims would have been handled in this particular case or by which company, and I don't think it would even have been possible to calculate of all of the claims. Certainly it was possible to say how much actually was paid because the companies found out what the fraud was, but I don't think it would have been possible on this record to come up with some X factor of how much you would reduce the claims down to what was likely to have been paid, not in a case like this. Setting aside the absence of the testimony in response to Ms. Wright's argument that there was overwhelming evidence that sort of everyone knew, everyone understands, what's your response to that? Everyone knew or understands about the Medicaid reimbursement formula that Medicare doesn't pay the full freight. In response to a question of mine, she said that it was overwhelmingly clear that everyone understood that. Ms. Wright. Well, I think most people in America who have insurance understand that there's a difference between what the hospital bills and what your insurance company pays, but that doesn't mean that the defendants intended to get less money, and that's what the focus of the guidelines is. What did the defendant intend is the loss, and the intent here was for the defendants to bill Medicare as much as they possibly could each and every time. One of the things that I found unusual about the loss amount here, if my math is right, and I hope you'll tell me if it's wrong, is that something like 85% of the loss amount came from the uncharged conduct. From GA&S, yes. It's kind of confusing because the amount that the court added in to the loss was just the amount that United billed. There were charts that showed that GA&S billed other insurance companies besides United, including some small amount to Universal, but most of the claims came from United, and that was $10.5 million. But that wasn't in the indictment? No, it was not. That was a company that was located down in South Florida in the Southern District. This is a Middle District case, and Universal . . . That's why you didn't charge it, because the clinics are out of your jurisdiction? That's what they said at sentencing, yes. That's what the trial prosecutor . . . I wasn't the trial prosecutor, but that's what she said at sentencing, yes. Is that right? Yes. What the explanation at sentencing was that United was a South Florida company and that all the billing was there, but we had venue over Universal because they were in St. Pete. Here's what I was thinking about. That means that the South Florida U.S. Attorney's Office could charge that conduct, couldn't they, since these defendants have never been convicted of it? They were still submitting billings in 2010 from GA&S, but it's now 2017. Well, I mean, set aside the statute of limitations. There could have been a dual prosecution, yes. Generally, we don't do that. It just occurred to me that that same loss amount could be ordered in separate sentencing. It could have, Your Honor. I think that if they had decided to go forward in the Southern District, they could, but the guidelines contemplate relevant conduct on a GA&S was inextricably intertwined with everything that they did here. They had the same victim companies, all Medicare Part C, the same participants. Dennis Dean was at GA&S. He recruited Brian Kelly, who recruited Thomas Mitchum. All three of those individuals carried through to the next clinic, Morgan, and to the next clinic, Gables. I doubt that Dennis Dean was involved in any of the billing from NGF. I don't know specifically, but he was probably dead by then. But the same participants, the same participating doctor, they used the same billing companies. They carried out the same scheme to the extent of billing the same medical codes. Some of them dropped off. They weren't billing for the IgG infusions or the cytomegalovirus medication as they had been at GA&S, but the same facet point injections, the same kind of expensive procedures that were performed more often and without the supportive care that would have made them appropriate billings. The scheme was identical, and the defendants moved the money. Mario especially. Mario controlled the accounts. That's what they said at sentencing. Mario was the one who was responsible for moving the money from one account to another. There were 33 bank accounts we analyzed. May I ask you another question? I haven't talked about this case with my colleagues. We're always looking for the best way to find consensus. I was just wondering on this. The briefs talk about whether the 2015 amendments were clarifying amendments or some sort of amendments. Do we even need to decide that? I don't think so. Okay. I do think that the unpublished case, Alvarado got it right. The Gertschauer criteria seemed to indicate that the 2015 amendment is not retroactive. I don't think that the amendment is necessarily inconsistent with this court's case law because the Moran case that we saw . . . But it doesn't affect the resolution here. It doesn't. We can decide this case without saying three words about it. Nope. That's exactly right because the court found, and it's supported in the record, that Mario intended the conduct that constitutes sophisticated needs. But in any event, what she said was, I've considered the 2015 amendments. Yes. Yes, she did. Which were impending at that point. She said that. I don't know that she actually announced a ruling with respect to whether or not they were retroactive. I don't think Alvarado had been decided by that point. But she certainly did say she considered them. And as far as she was concerned, if it applied, then Mario was still responsible for the sophisticated means because he participated in the conduct that was sophisticated. And that's not just the cover-up. It includes the banking. And that was substantial. He profited hugely. Also the intended loss. Yes. Yes. Also that. Also that. Mario himself, Gladys got about 400, maybe 450 from GA and S. Mario got 700,000 from GA and S. 700,000 were disbursements to him. And he was the one who was moving the money from bank to bank to bank, which would have made it impossible for the insurance companies, which had paid by direct deposit into their accounts, to claw that money back when they uncovered the fraud. Now, with respect to his role, Mario is most certainly less culpable than Gladys. Gladys was doing all the billings and she was making all the phone calls. I do not agree that he was less culpable than Brian Kelly. Brian Kelly was a drug distributor, no question about it. But Mario participated in that drug distribution. Mario hand-delivered prescriptions. Mario even got a prescription filled in his name for hydrocodone, which Mark Adams needed to take so that they could continue to sell the oxycodone that he prescribed. And on top of that, this whole drug distribution scheme was something that they figured out they could do to pay kickbacks without any of the cash coming out of their pocket. Instead, it was genius. Medicare paid the kickback for him. Medicare filled the prescription. And then the patient participants sold it. Mario made a very lot more money than those patient participants. Brian Kelly, it appears, was paid about $10,000, at least in checks that we can . . . So even if there was error to conclude that comparing Mario with Kelly was wrong, there were other participants. Oh, a whole bunch of them. About whom, on this record, the court could have found that Mario was not less culpable than them. And she did. I mean, when she announced her specific findings, she talked about the other patients. She mentioned Kathleen Ortega. I know that she mentioned one of the others. I can't remember if it was Mark Adams or Jonathan Jones, but she mentioned them. All of those patient participants, including Dennis Dean, who had ultimately complained to Universal and ultimately is the one that broke the case, and including Brian Kelly . . . Were these other patients knowing conspirators in the plot? Yes. Thomas Mitchum testified, you went to the clinic, you signed in, you got paid your $50. And he testified that that happened at GANS and Morgan, as well as at Gables. The patients knew. Kathleen Ortega said physical therapy. I've had physical therapy. Those massages, that wasn't physical therapy. They went for the kickbacks. They did not go to these clinics so that they could get any kind of medical treatment. In fact, Mark Adams complained that he needed a real doctor. And it was fine to get this money from the drug kickbacks, and it was fine to get the occasional $50 or $100 or $150 that they paid whenever they got around to it, whenever their insurance claims were paid. But what he really ultimately wanted Brian Kelly to help him find a real doctor.  He did not want to go down any of the drugs he was taking. So none of the billing through any of the three clinics, or four clinics if you count NGF, was legitimate. And the patient participants all participated in that aspect of the fraud. They knew they were getting paid, and they knew they weren't getting medical services. Not real ones. So they most certainly were participants. And if you count them up, I think you get to nine or ten. You know, the court credited Miguel Sanchez Martinez, the doctor who faked the patient notes. The court included that person in the calculations of the five participants. And certainly because he was copying notes over from day to day to day, the exact same vital signs from one patient's day to the next time that patient was treated, the court easily could have found that he was a knowing participant. He was not charged. Armando Solis, the unlicensed doctor who was there when they were billing for Ocampo, he also could have counted. But you don't even have to get to them. If you just count up the patient participants, you're way over more than five. And in terms of Gladys's participation, by the way, the court also found that it was a very extensive conspiracy. So you don't necessarily have to count noses. But with respect to Mario's participation and whether or not he was entitled to a minor role, he was not less culpable than all the rest. He was just a very lot less culpable than Gladys. If the court has no other questions, I'll ask you to affirm. Thanks very much. Ms. Wright. I would remind the court that as far as counsel's position that the trial court did not calculate a formula and that on these facts it's not possible, that that goes to the initial burden on the government by preponderance of the evidence to present a basis for the loss to the fault, to an aggregate loss because it's allegedly not possible. Obviously, it's a high burden, a high price for any criminal defendant to bear. So I understand that argument, actually, because that's part of my argument, especially with the uncharged conduct, to include that loss when we have the I think Ms. Ezel from Universal as the crux of that testimony and later put that loss into a loss calculation and say, well, we just can't determine on this record, so therefore we're just going to default and throw it all in. That is grossly unfair. That goes against subjective intent. It goes against a reasonable sentence. I would submit to the court that that should hopefully not be acceptable as a basis for such an extremely higher sentence than would otherwise be if the court just limited the loss to the charged conduct. Also, the council wanted to argue that the amendments to the November 15th amendment also highlights the duty upon the court to constrain the loss to relevant conduct and to specific intent or basically to what the particular defendant was intending to do. I think that that does apply in this case as far as loss. I think by not having the loss calculation address the Medicare rate and the overwhelming acknowledgment that this subjective defendant did not expect to get all the payments, the record shows that she's getting less consistently, that she's always gotten less, and she's making inquired specific phone calls and follow-up throughout the conspiracy to the billing company and not disappointed when she's receiving less. To overlook that and say we just can't figure it out, if you can't figure it out, especially the remote 404B loss, it shouldn't be counted. I understand that it's difficult. The case law talks about it. It's difficult. It's a difficult decision, but I think there was so much testimony on the record here that that rate was known to all parties that it's incumbent on the court to address the fact that the government can't come up with a loss amount. That's fair. Thank you. Thanks very much, counsel. We'll finally hear from Ms. Borghetti. Thank you. Let me ask you a preliminary question to pick up where your colleague left off. Why couldn't on this record the district court find that Mario was not less culpable than the patients who were knowing participants in the plot? If indeed she could do that without clear error, doesn't that really end the relationship between Mario and Kelly? Yes, Your Honor. It may, but I think the court when looking at everything that she looked at, couldn't get past that Mario was married to Gladys, and Gladys was more culpable, and that she and he were life partners. The other thing that the court couldn't get past, the one thing, and she said this in the sentencing, was that he got the majority of funds. In addressing my opposing counsel's argument about him being named on the bank accounts, it's just a formality. People in a business move money every day. It doesn't necessarily mean that that's fraudulent or illegitimate. Can I ask you a quick question? You sort of breezed past the fact that the district court thought it was the majority of the money. Why is that insignificant? That seems fairly significant. It's significant, but I think that's what she based her whole . . . She just couldn't get past that he got the $700,000. Wasn't it the $700,000 plus being on the bank accounts, plus being the, what was it, the vice president of Gables formally, plus participating in the obstruction? I mean, it was more than just the $700,000, right? Yes, it was more than the $700,000. Part of it, I think, besides what Your Honor has said, was this delivery of scripts, which was very prejudicial because there was no ability to cross-examine this gentleman who was deceased. I want to come back again to the question. Assuming we just look at the $700,000, why couldn't the district court say without committing clear error that the very payments were so disparate as between what he received and what the patients received, that he was simply not less culpable than most of the other participants, i.e., the patients, without saying one word about Kelly? Well, just receiving money I don't think is enough to . . . His actions in the endeavors, that was it. He didn't have any other role besides getting a share. Okay. Thank you very much. I note, Ms. Wright and Ms. Borghetti, that you were court-appointed, and we very much appreciate you taking on the burden of representing your clients at the request of the court. Thank you. We will proceed to the next case, which is . . .